IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 4, 2004 Session

## ANTHONY AND MELINDA K. COLSTON v. CITIZENS TRI-COUNTY BANK

**A Direct Appeal from the Circuit Court for Marion County**
**No. 13130      The Honorable Buddy D. Perry, Judge**

---

**No. M2003-01379-COA-R3-CV - Filed October 20, 2004**

---

Following Appellees' default on promissory note secured by a deed of trust, Appellant Bank placed a hold on Appellees' accounts and instigated foreclosure proceedings. Despite the fact that Appellees cured the default, Appellant Bank continued its hold on accounts and failed to stop publication of foreclosure notice. Although Appellees failed to prove damages, trial court found Bank negligent and awarded nominal damages to Appellees. We reverse.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

M. Keith Davis of Dunlap, for Appellant, Citizens Tri-County Bank

Paul S. Weidlich of Chattanooga, for Appellees, Anthony and Melinda K. Colston

**OPINION**

On January 20, 1994, Anthony Colston and his wife, Melinda Colston (together, the "Colstons," "Plaintiffs," or "Appellees") purchased the residential real property at 465 Elm Street in Whitwell, Tennessee (the "Property"). The purchase price was $75,000.00. The Colstons financed the purchase of the Property with a loan of $56,250.00 from Citizen's Tri-County Bank (the "Bank," "Defendant," or "Appellant") secured by a deed of trust. After purchasing the Property, the Colstons made extensive improvements. An appraisal conducted by Thurston Davis Realty in February 1995, and admitted as Exhibit 15, values the Property at $192,721.80. An appraisal conducted by Gene West in April 1997, and admitted as Exhibit 16, values the property at $195,000.00.

On October 15, 1996, the Colstons renewed a 1995 promissory note for a $150,000.00 line of credit and executed the promissory note, which is the subject of this litigation (the "Note"), in

favor of the Bank. The Note had a principal value of $157,800.00 and a maturity date of October 15, 1997. The Note provided for a balloon payment due on the maturity date but included a 30-day grace period before any interest would begin to accrue on the principal. The Colstons pledged the Property and two other tracts of real estate as collateral on the Note. The Note contains a "Right of Setoff" clause, which reads as follows:

> I grant to Lender a contractual possessory security interest in, and hereby assign, convey, deliver, pledge, and transfer to Lender all my right, title and interest in and to, my accounts with Lender (whether checking, savings, or some other account), including without limitation all accounts I may open in the future, excluding however all IRA, Keogh, and trust accounts. I authorize Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on this Note against any and all such accounts.

According to Mr. Colston's testimony, shortly after the October 15, 1997 due date, he met with Cindy Woods, a Vice-President at the Bank. At that meeting, Mr. Colston testified that he told Ms. Woods that he might have a buyer for the Property. Although he allegedly told Ms. Woods that he was ready to make the balloon payment at that time, Mr. Colston testified that Ms. Woods advised him not to make the balloon payment and not to renew the Note because he was about to close on the sale of the Property. Ms. Woods testified that she did not advise Mr. Colston to wait to renew the Note or to pay the Note off until he closed on the sale of the Property. Lisa Layne, an employee of the Bank, testified that she began trying to contact the Colstons on October 19, 1997 and was told by the Colstons that they would renew the Note on November 13, 1997. When the Colstons failed to renew, the Bank, on December 1, 1997, placed a hold on two of the Colstons' checking accounts and one of their savings accounts, the cumulative balance of which was approximately $6,000 to $8,000. The Colstons did not know that their accounts had been frozen until January 30, 1998. Ms. Woods testified that the Bank had no legal obligation to notify the Colstons of a "hard hold" on the accounts. Despite placing a hold on the accounts, the Bank continued to pay the Colstons interest on their interest-bearing accounts.

On December 11, 1997, the Bank instructed its attorney, L. Thomas Austin, to send a letter to the Colstons. The letter reads, in relevant part, as follows:

> I have been contacted by Citizens Tri-County Bank in regard to a note you signed on or about October 15, 1996. It is my understanding that this note is past due.

> I would suggest that you contact the Bank and make arrangements to get your payments caught up to date immediately. Upon your failure to have this matter rectified within ten (10) days from the date of this letter, I will have no choice but to take whatever steps I deem necessary to protect the Bank's interest.

Please be aware that if the Bank is forced to file a lawsuit against you, you will not only be responsible for the amount due on the note, plus accrued interest; but you will also be responsible for attorney fees and court costs. Therefore, it would be to your advantage to get this matter taken care of immediately so that legal action will not be necessary.

After receiving this letter, Mr. Colston testified that he again spoke with Ms. Woods and she allegedly told him "not to worry about it." Ms. Woods testified that the Bank's requesting this first letter was not in error because the loan was in default at that time. On December 29, 1997, the Bank requested its attorney to begin foreclosure proceedings. This request was allegedly made as a result of the Colstons' failure to make arrangements with the Bank to either pay off the delinquent Note or to renew it.

On January 30, 1998, the Colstons sold one of the two tracts of land that served as collateral for their Note and used the proceeds to reduce the principal and interest on the Note. The Colstons then borrowed $123,282.08 from the Bank and used the loan proceeds to satisfy the remaining balance due on the Note. Following this transaction, the Bank did not release the hold on the Colstons' accounts. However, Ms. Woods testified that she contacted Mr. Austin's office to request that foreclosure proceedings against the Colstons be stopped.

Despite the fact that the Colstons had cured their default, and despite Ms. Woods' conversation with Mr. Austin's office, on February 17, 1998, Mr. Austin sent a second letter to the Colstons, which reads, in pertinent part, as follows:

I represent Citizens Tri-County Bank in regard to the foreclosure of your property. I am enclosing a copy of the foreclosure notice to be published in the Jasper Journal beginning on February 24, 1998, with the sale of the property to be conducted on March 25, 1998, you may govern yourself accordingly.

Ms. Woods testified that this letter was sent in error. Mr. Colston testified that Ms. Woods called him before he received this letter and told him "not to worry about it" because the letter was an "error." Despite Ms. Woods' assurances , the foreclosure notice was published in the *Jasper Journal* on February 24, 1998. Ms. Woods testified that the published notice was an error. Glenn Barker, the President of the Bank, also admitted that the published foreclosure notice was an error. However, the Bank never instigated a retraction of this foreclosure notice, even after the Colstons had requested a retraction.

In July 1998, the Colstons sold the Property for $131,900.00. On July 15, 1998, the Bank released the hold it had placed on the Colstons' accounts after the Colstons sold the Property and used the proceeds from the sale to satisfy their indebtedness to the Bank.

As a result of the erroneous publication of the Notice of Foreclosure, on October 20, 1998, the Colstons filed a Complaint in the Marion County Circuit Court, alleging various causes of action, including negligent misrepresentation, breach of contract, conversion, and negligence, against the Bank. The Bank answered on December 29, 1998. The Bank was granted leave to amend their Answer to include the affirmative defenses of comparative fault and statute of frauds. The Amended Answer was filed on March 20, 2000.

The Bank filed a Motion for Summary Judgment on August 23, 2000. The Motion for Summary Judgment was denied and the matter proceeded to trial on March 6, 2003. On April 15, 2003, the trial court entered its Judgment, which reads, in relevant part, as follows:

> ...the Court hereby finds that the Plaintiffs carried their burden of proof regarding their allegations that the Defendant erroneously caused the publication of a Notice of Foreclosure and that the Defendant was negligent when it failed to release the hold on the Plaintiff's bank accounts. However, the Court finds that the Plaintiffs were not able to prove by a preponderance of the evidence that they sustained any damages as a result of the erroneous publication of the Notice of Foreclosure. The Court does find that the Plaintiff sustained nominal damages in the amount of $2,000.00 as a result of the Defendant's failure to remove the hold on the Plaintiffs' bank accounts. It is therefore ORDERED, ADJUDGED AND DECREED that Plaintiffs be awarded a judgment against the Defendant in the amount of two thousand dollars ($2,000.00) as a result of Defendant's failure to remove the hold on Plaintiffs' bank accounts.

The Bank appeals from this Judgment and raises the following issues for review as stated in its brief:

> 1. Whether the trial court erred when it awarded the Plaintiffs a judgment based upon its holding that the Defendant was merely negligent in failing to remove the hold which it placed on the Plaintiffs' account when the Plaintiffs did not bring a cause of action for negligence nor did they seek to amend their pleadings so as to bring a cause of action for negligence and the statute of limitations for bringing said action expired prior to trial?

> 2. Whether the actions of the Plaintiffs (which the trial court concluded set the entire sequence of events into motion) were at least fifty percent at fault for the injuries which they claim to have sustained and, if so, whether the trial court erred when it awarded them a judgment?

3. Whether the actions of the Defendant in placing a hold upon the Plaintiffs' bank accounts upon their failure to timely satisfy a loan constitutes the intentional tort of conversion of property?

4. Whether the Plaintiffs satisfied their burden of proof in regards to their claim for the intentional tort of conversion when the proof presented at trial does not reflect that the Plaintiffs suffered an injury?

5. Whether the judgment awarded to the Plaintiffs properly reflects the evidence presented at trial?

The Colstons raise the following additional issue in their brief:

Whether the trial court erred when it found that the Colstons had not proven by a preponderance of the evidence that they suffered damages in the form of the diminished sale price of their real property as a direct and proximate result of the Bank's erroneous publication of a foreclosure notice for the real property?

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

## Issue 1

The Bank first asserts that the trial court erred when it found the Bank to be simply negligent for its failure to release the Colstons' frozen accounts. Specifically, the Bank contends that the Colstons never brought a cause of action for negligence regarding the held funds. Rather, the Colstons' Complaint alleges only the tort of conversion in relation to these held funds and, consequently, the Bank asserts that the Judgment is contrary to the pleadings and the evidence.

It is true that the Colstons' Complaint does not specifically assert that the Bank was negligent in continuing to retain its hold on the Colstons' accounts. It is also true that the Colstons never moved to amend their pleadings to conform with the evidence adduced at trial. However, Tenn. R. Civ. P. 15.02 states, in relevant part, that:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they *shall be treated in all respects as if they had been raised in the pleadings*. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues *may be made* upon motion of any party at any time, even after judgment; *but failure so to amend does not affect the result of the trial of these issues*....

(emphasis added).

Under Tenn. R. Civ. P. 15.02, neither the fact that negligence on this specific basis was not averred in the Complaint nor the fact that the Complaint was not amended to comport with the evidence adduced at trial is fatal to the trial court's Judgment. Consequently, this issue is without merit.

## Issue 2

The Bank next asserts that the trial court erred in failing to find that the Colstons were at least fifty percent (50%) at fault. The trial court made the following relevant findings of fact from the bench:

> ...although Mr. Colston is very indignant about what happened to him, started because he didn't pay his note when he was suppose to, and I mean, there's just no way around that. Not only did he not pay it when he was suppose to, he didn't pay it within 30 days of when he was suppose to, or 60 days, or 90 days.

While it is true that Mr. Colston failed to pay or renew the Note in a timely fashion, the gravamen of the trial court's Judgment against the Bank stems from the Bank's actions after January 30, 1998, the date the Colstons cured their default. After January 30, 1998, whatever negligent role the Colstons had in this matter had been cured. According to the record, the Bank's failure to release the hold on the Colstons' accounts, and its alleged error in going ahead with publication of the foreclosure notice, was not offset by any continuing or new negligence on the part of the Colstons. Consequently, this issue is without merit.

## Issues 3 and 4

Although the Colstons raised conversion in their Complaint, the trial court's Judgment is for simple negligence only. Since the trial court did not find the Bank liable for conversion of the Colstons' funds, and did not award any damages for conversion, these two issues are without merit.

## Issue 5

The Bank's final issue concerns whether the evidence supports the trial court's Judgment. We will address this issue in conjunction with the Colstons' issue concerning whether the trial court erred in finding that there were no damages stemming from the Bank's erroneous publication of the foreclosure notice.

As noted above, the trial court found the Bank liable for simple negligence on two grounds: (1) in causing the publication of the Notice of Foreclosure and (2) in failing to release the hold on the Colstons' accounts. "[I]n order for there to be a cause of action for common law negligence, the following elements must be established: (1) a duty of care owed by the defendant to the plaintiff; (2)

conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal cause." **McClenahan v. Cooley**, 806 S.W.2d 767, 774 (Tenn.1991). Injury or loss (i.e. damages) is a prima facie element of negligence. In the instant case, the trial court found that the Colstons "were not able to prove by a preponderance of the evidence that they sustained any damages as a result of the erroneous publication of the Notice of Foreclosure."

We have reviewed the entire record in this case and we agree with the trial court that the Colstons have failed to meet their burden concerning damages stemming from the Bank's alleged negligence. Mr. Colston testified that he told Ms. Woods that he would not try to withdraw from the accounts on which the holds were placed. The record indicates that the Colstons discovered the holds only when they tried to combine their accounts into one certificate of deposit. However, the Colstons did not actually try to withdraw funds from these accounts at any time. Also, the Bank continued to pay interest on the interest-bearing accounts on which the holds were placed. Consequently, the Colstons have not proven that they suffered any adverse effects from the Bank's prolonging its hold on their accounts.

Concerning any damages stemming from the Bank's failure to stop publication of the Notice of Foreclosure, we find that the Colstons also failed to meet their burden. The evidence in record is that the Property is a unique home, in that it is a converted school building. Although the Property has been extensively renovated by the Colstons, the testimony adduced at trial is that the Property is unlike other homes in the area, that it is larger by comparison and, consequently, well outside the usual price range for homes in the neighborhood. The record indicates that the Colstons first listed the Property for sale in 1995 at a list price of $215,000.00. Jan Terry, the Colstons' realtor, testified that she received no offers at that price and that the sales contract expired. In September 1996, the Colstons listed the Property again with Dobbins Real Estate for $225,000.00 and, again, received no offers. In September 1997, the Property was listed with Century 21 for $171,500.00. When the Property did not sell, the asking price was lowered to $159,000.00 but the Property still did not sell. Finally, in March 1998, the Property was listed at $135,000.00 and finally sold for $131,900.00. From the record, it is clear that this Property was not an easy sale and that the Colstons were forced to compromise on price, not because of the Notice of Foreclosure, but because of the uniqueness of the Property.

Mr. Colston testified that he had arranged to sell the Property to Gina Bunch. Mr. Colston asserts that their agreement fell through because of the Notice of Foreclosure (i.e. Ms. Bunch said that she would wait until the foreclosure sale and get a better deal). However, Ms. Bunch testified that her decision not to go through with the purchase had nothing to do with the Notice of Foreclosure. Rather, she testified that the Property was simply too large. There is nothing in the record to support the Colstons' contention that the Notice of Foreclosure precluded them from selling the Property, or had any bearing on the price for which it finally did sell.

The trial court found that the Bank was negligent and awarded the Colstons $2,000.00 in "nominal damages." It is well settled that, in negligence cases wherein damages are an element of the right to recover, nominal damages are never proper. *See Skoretz v. Cowden*, 707 S.W.2d 529,

532 (Tenn. Ct. App.1985); *Morris v. State,* 21 S.W.3d 196, 203 (Tenn. Ct. App. 1999). Since the Colstons did not prove damages, the trial court should have awarded them nothing on the ground of negligence and, indeed, should not have found the Bank negligent at all absent sufficient proof of each element of that tort. Negligence without injury is not actionable. *Wood v. Parker*, 901 S.W.2d 374, 381 (Tenn. Ct. App.1995); *see also Security Bank & Trust Co. v. Fabricating, Inc.*, 673 S.W.2d 860 (Tenn. 1983).

For the foregoing reasons, we reverse the Judgment of the trial court. Costs of this appeal are assessed to the Appellees, Anthony and Melinda K. Colston.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.